Ross B. Jones, Esq., SBN 120593
ROSS B. JONES, ATTORNEY AT LAW
131A Stony Circle, Ste. 500
Santa Rosa, California 95401
Telephone: (707) 524-9433
Email: ross@rossjoneslaw.com

Attorneys for Plaintiffs
TOBIAS DODGE and HUMBOLDT
GROWERS NETWORK, INC.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| In re<br><br>DAVID PRESTON ADDINGTON<br><br>Debtor.<br><br>SSN: XXX-XX-3795 | Case No. 25-40890 WJL 11<br><br>Chapter 11<br><br>A.P. No. 25-04032<br><br>**DECLARATION OF ROSS B. JONES IN SUPPORT MOTION FOR SUMMARY JUDGMENT DETERMINING DEBT TO BE NONDISCHARGEABLE 11 U.S.C. §523(a)(6)**<br><br>Date: October 7, 2026<br>Time: 10:30am<br>Place: In Person<br>or via Zoom/AT&T Teleconference<br>Courtroom 220<br>1300 Clay St., Room 220<br>Oakland, California<br><br>Judge: Hon. William J. Lafferty, III |

I, Ross B. Jones, declare:

1. I am counsel for Plaintiffs Tobias Dodge and Humboldt Growers Network, Inc. I make this declaration in support of Plaintiffs' Motion for Summary Judgment Determining Debt to Be Nondischargeable pursuant to 11 U.S.C. §523(a)(6).

2. The matters below are based on my personal knowledge, and if called as a witness I could and would testify as to the matters described below.

3. Attached as Exhibit 1 to this Declaration is a true and correct copy of the Amended Cross-complaint filed by Tobias Dodge and Humboldt Growers Network, Inc., against David Addington and Piner Partners, G.P. Sonoma County Case No. SCV-264723, on May 1, 2020 ("State Court Action").

4. Attached as Exhibit 2 to this Declaration is a true and correct copy of the Amended Final Statement of Decision filed by the court in the State Court Action on November 8, 2023.

5. Attached as Exhibit 3 to this Declaration is a true and correct copy of the Ruling On Matter Taken Under Submission re: Order to Show Cause re: Vexatious Litigant, filed by the court in the State Court Action on April 10, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed August 13, 2026.

/s/ *Ross B. Jones*
Ross B. Jones

# EXHIBIT 1 TO DECLARATION

# OF ROSS B. JONES

**Amended Cross-Complaint filed by Tobias Dodge and Humboldt Growers Network, Inc., against David Addington and Piner Partners, G.P. Sonoma County Case No. SCV-264723**

Ross B. Jones, Esq., SBN 120593
Marlon V. Young, Esq., SBN 142939
MERRILL, ARNONE & JONES, LLP
3554 Round Barn Boulevard, Suite 303
Santa Rosa, California 95403
Telephone: (707) 528-2882
Facsimile: (707) 528-6015

Attorneys for Defendants and Cross-Complainants
HUMBOLDT GROWERS NETWORK, INC.;
TOBIAS DODGE and Defendant STEVE DODGE

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**5/1/2020 11:06 AM**
**Arlene D. Junior, Clerk of the Court**
**By: Griselda Zavala, Deputy Clerk**

SUPERIOR COURT OF STATE OF CALIFORNIA

COUNTY OF SONOMA

DAVID ADDINGTON, an individual, and PINER PARTNERS, a California general partnership,

Plaintiffs,

v.

RIDGEWAY DISTRIBUTION, LLC, a California registered limited liability company; VIRGINIA PASINI, an individual; ANTHONY PIZZARELLI, and individual; NACC, INC., a California corporation; and DOES 1 -50,

Defendants.

---

RIDGEWAY DISTRIBUTION, LLC, a California registered limited liability company;

Cross-Complainant,

v.

DAVID ADDINGTON, an individual, CALIFORNIA CHAMP, LLC, a California limited liability company, PINER PARTNERS, a California general partnership, a California general partnership, Does 1-50, inclusive,

Cross-Defendants.

CASE NO. SCV-264723

[UNLIMITED CIVIL JURISDICTION]

**DEFENDANTS TOBIAS DODGE AND HUMBOLDT GROWERS NETWORK, INC.'S AMENDED CROSS-COMPLAINT FOR BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; INTERFERENCE WITH ECONOMIC RELATIONS.**

Action Filed: September 5, 2019

Assigned to One Judge for All Purposes:
Hon. Arthur A. Wick – Dept. 17

TOBIAS DODGE, an individual, and HUMBOLDT GROWERS NETWORK, INC. a California corporation,

Cross-Complainants,

v.

DAVID ADDINGTON, an individual, and PINER PARTNERS, a California general partnership, and DOES 1 -50,

Plaintiffs and Cross-Defendants.

## GENERAL ALLEGATIONS

Cross-Complainants allege:

1. Cross-Complainant TOBIAS HAFENECKER-DODGE, aka TOBIAS H. DODGE ("Tobias"), is and at all times mentioned in this Cross-Complaint has been a resident of San Francisco, California.

2. Cross-Complainant HUMBOLDT GROWERS NETWORK, INC. is a California corporation duly organized with its principal place of business in Sonoma County, California.

3. Cross-Complainants are informed and believe, and based thereon allege, that Cross-Defendant DAVID ADDINGTON ("Addington") is, and at all times mentioned in this Cross-Complaint has been a competent adult, and a resident of Alameda County, California.

4. Cross-Complainants are informed and believe, and based thereon allege, that Cross-Defendant PINER PARTNERS ("PINER GP") is, and at all times mentioned in this Cross-Complaint has been, a California general partnership, and party to a contract at issue in this action. Cross-Complainant is further informed and believes, and based thereon allege, that Cross-Defendant DAVID ADDINGTON is the majority owner of PINER PARTNERS.

5. Cross-Complainants are ignorant of the true names of Cross-Defendants ROES 1-10, inclusive, and have therefore sued them by the above names which are



Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 5 of 58

fictitious. Cross-Complainants will amend this Cross-Complaint by inserting true names in lieu of the fictitious names when the true names are ascertained. Cross-Complainants are informed and believe and based thereon allege that each of the Cross-Defendants designated in this Cross-Complaint as ROE is responsible and liable to Cross-Complainants in some manner for the events, happenings, and contentions referred to in this Cross-Complaint. All references in this Cross-Complaint to Cross-Defendants shall be deemed to include all ROE Cross-Defendants.

6. Cross-Complainants are informed and believe and based thereon allege that each Cross-Defendant, including ROES, was and is the agent, employee, servant, subsidiary, partner, member, associate, or representative of each other Cross-Defendant, including ROES, and all of the things alleged to have been done by the Cross-Defendants were done in the course and scope of the agency, employment, service, subsidiary relationship, partnership, membership, association, or representative relationship and with the knowledge and consent of their respective principals, employers, masters, parent corporations, partners, members, associates, or representatives.

**TRANSACTIONAL FACTS**

7. Cross-Complainants are informed and believe and based thereon allege Cross-Defendant PINER GP is a sublessee under a written agreement for commercial property located at 947 Piner Place in Santa Rosa, California ("Premises").

8. California and local land-use and permitting laws and regulations strictly limit the permissible geographic locations for cannabis distribution. Because the Premises fall within such a permissible geographic location, it is highly desirable for individuals and companies wishing to engage in lawful cannabis distribution under California and local law.

9. Because HUMBOLDT GROWERS NETWORK was not yet incorporated, on November 1, 2017, PINER PARTNERS GP signed a written sublease with Plaintiff TOBIAS effective November 1, 2017, for a portion of the Premises, pending formal incorporation of HUMBOLDT GROWERS NETWORK ("Plaintiffs' Sublease").



Case: 25-04032 Doc# 32 Filed: 08/13/25 Entered: 08/13/25 17:18:55 Page 6 of 58

10. Cross-Complainants are informed and believe and based thereon allege that shortly after HUMBOLDT GROWERS NETWORK was incorporated, Cross-Defendant PINER PARTNERS GP entered into an identical Sublease for the same portion of the Premises with HUMBOLDT GROWERS NETWORK, effective on or about November 11, 2017. The monthly rent under Plaintiffs' Sublease is $4,000.

11. Cross-Complainants are informed and believe and based thereon allege that Piner GP, through Addington, subleased other portions of the Premises leased by Piner GP to Defendants Ridgeway Distribution, LLC, California Champ, LLC, and TBKCA, LLC.

12. The Sublease provided, among other things, that Tobias/HUMBOLDT GROWERS NETWORK shall occupy and use the subleased premises for the commercial distribution of cannabis and other related uses; and that the parties agreed to make best efforts to maintain strict compliance with all California laws and regulations pertaining to cannabis.

13. The Sublease provided for Tobias/HUMBOLDT GROWERS NETWORK to pay a nonrefundable moving fee of $100,000, to be "used in whole or in part to improve 947 Piner Place so it will be able to operate as a distribution hub" for cannabis distribution.

14. Cross-complainants are informed and believe, and based thereon allege, that the intent of the subleases between Piner GP and Tobias/ HUMBOLDT GROWERS NETWORK, Ridgeway Distribution, LLC, California Champ, LLC, and TBKCA, LLC was for all of the entities to use the leased premises as a "distribution hub"; in particular for the sublessees to benefit from shared common workplace areas.

15. Cross-Complainants are informed and believe and based thereon allege Cross-Defendants PINER GP knew and agreed that HUMBOLDT GROWERS NETWORK ("HGN"), once formed, would occupy the Premises under the Sublease; the Sublease included a floor plan providing "HGN contiguous space within its office space, this access includes the Sally Port area."

16. Beginning in mid-2019 and continuing to this day, Piner GP and Addington undertook a course of conduct to force Tobias and HUMBOLDT GROWERS NETWORK from the Subleased Premises, including but not limited to:

a. Repeatedly installing chain locks on the door to the subleased Premises that impede Tobias' and HGN's access to the Subleased Premises;

b. Repeatedly installing interior walls and locked doors which impede Tobias' and HGN's access to the Subleased Premises;

c. Repeatedly refusing Tobias and HGN access to the common areas and Sally Port and,

d. Defendants wrongfully taking Tobias Dodge's and Humboldt Growers Network's property and placing it under lock and key, depriving them the use of their property.

**FIRST CAUSE OF ACTION**
**(Breach of Written Agreement)**

17. Cross-Complainants reallege and incorporate paragraphs 1 through 16, inclusive of the Cross-Complaint as if set forth fully herein.

18. The written Sublease between Cross-Complainants and Cross-Defendants stated, among other things, that Cross-Complainants would be entitled to use and occupy the space and to serve as a distribution hub.

19. Cross-Complainants have performed all conditions and covenants required by them to be performed under the Agreement.

20. Cross-Defendants' actions describe above constitute material breaches of the Agreement.

21. By reason of Cross-Defendants' breach, Cross-Complainants have been damaged in a sum to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

22. Cross-Complainants reallege and incorporate paragraphs 1 through 21,


Case: 25-04032 Doc# 32 Filed: 08/13/25 Entered: 08/13/25 17:18:55 Page 8 of 58

inclusive of the Cross-Complaint as if set forth fully herein.

23. The Sublease referred to above contained an implied covenant of good faith and fair dealing, which obligated Cross-Defendants to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act that would prevent or impede Cross-Complainants from performing any or all of the conditions of the contract that they agreed to perform, or any act that would deprive Cross-Complainants of the benefits of the contract.

24. Cross-Defendants breached the above-implied covenant of good faith and fair dealing by their above-described actions.

25. Cross-Complainants are informed and believe and based thereon allege that each Cross-Defendants engaged in the above-described actions for reasons extraneous to the Sublease, with the intent to deprive Cross-Complainants and the other subtenants of their rights and occupancy so that Cross-Defendants could occupy the premises for their own exclusive use and benefit, regardless of the contracts between Cross-Defendant and Cross-Complainants.

26. As a proximate result of Cross-Defendants' breach of the implied covenant of good faith and fair dealing, Cross-Complainants have suffered, and continues to suffer, losses and damage in an amount to be established at trial.

**THIRD CAUSE OF ACTION**
**(Interference with Economic Relations)**

27. Cross-Complainants reallege and incorporate paragraphs 1 through 26, inclusive of the Cross-Complaint as if set forth fully herein.

28. Cross-Complainants are informed and believe, and based thereon allege, that Cross-Defendants knew that Cross-Complainants had economic relationships for the distribution of harvested cannabis in compliance with California's law and regulation.

29. Cross-Complainants are informed and believe, and based thereon allege, that Cross-Defendants engaged in the above-described actions with the intent to disrupt Cross-Complainants' economic relationship with third parties necessary to engage in its

business.

30. Cross-Complainants are informed and believe, and based thereon allege, that the above-described actions of Cross-Defendants constituted breaches of their contract with Cross-complainants, and breaches of the implied covenant of good faith and fair dealing.

31. As a proximate result of Cross-Defendant's above-described acts, Cross-Complainants have suffered, and continue to suffer, losses and damage in an amount to be established at trial.

32. Cross-Complainants are informed and believe, and based thereon allege, that Cross-Defendant's acts alleged above were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

**WHEREFORE,** Cross-Complainants pray for judgment as follows:

1. For compensatory and consequential damages in an amount to be determined at trial.
2. For punitive and exemplary damages and for exemplary damages.
3. For costs incurred in this suit.
4. For such further relief as the court may deem just and proper.

Dated: May 1, 2020

MERRILL, ARNONE & JONES, LLP

By: */s/ Ross B. Jones*
Ross B. Jones, Attorney for Defendants and Cross-Complainants, Tobias Dodge and Humboldt Growers Network, Inc. and Defendant Steve Dodge



Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 10 of 58

## PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Sonoma, State of California. I am over the age of eighteen years and not a party to the within cause; my business address is 3554 Round Barn Boulevard, Suite 303, Santa Rosa, California 95403.

On the date stated below, I caused to be served in the manner indicated the foregoing:

**DEFENDANTS TOBIAS DODGE AND HUMBOLDT GROWERS NETWORK, INC.'S AMENDED CROSS-COMPLAINT FOR BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; INTERFERENCE WITH ECONOMIC RELATIONS**

on the parties involved addressed as follows:

| | |
|---|---|
| Michael P. Scott, Esq.<br>Law Offices of Michael P. Scott<br>P.O. Box 3802<br>Santa Rosa, CA 95402<br>Tel: (707) 799-4678<br>Fax: (707) 595-4883<br>Email: empeescottesquire@gmail.com | ***Counsel for Plaintiffs David Addington and Piner Partners:*** |
| David Addington<br>947 Piner Place, Ste. C<br>Santa Rosa, CA 95403 | ***In Pro per - Cross Defendants David Addington and Piner Partners*** |
| Daniel Raff<br>Raff Law, APC<br>17 Keller Street, Grace Building<br>Petaluma, CA 94952<br>Tel: (707) 879-8040<br>Email: draff@rafflawoffice.com | ***Counsel for Defendant and Cross-Complainant, Ridgeway Distribution LLC And Defendants NACC and Anthony Pizzareli:*** |
| Bob Haroche, Esq.<br>Beyers Costin Simon<br>A Professional Corporation<br>200 Fourth St, Suite 400; PO Box 878<br>Santa Rosa, California 95402-0878<br>Tel 707.547.2000<br>Fax 707.526.2746<br>bharoche@beyerscostin.com | ***Counsel for Defendant Virginia Pasini*** |

**[ X ]** **BY MAIL** on the party(ies) listed above in said action, in accordance with CCP § 1013(a), by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth above. In the ordinary course of business at the Law Offices of Merrill, Arnone & Jones, LLP, mail placed in that designated area is given the



Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 11 of 58

correct amount of postage, and is deposited that same day in a United States mailbox in the city of Santa Rosa, California.

[ ] **BY FACSIMILE** transmission, in accordance with CCP § 1013(e), to the party(ies) at the facsimile number(s) set forth above.

[ X ] **BY E-MAIL OR ELECTRONIC TRANSMISSION.** I caused the documents to be sent to the person(s) at the email address(es) set forth above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[ ] **BY OVERNIGHT DELIVERY** on the party(ies) set forth above in said action, in accordance with CCP § 1013(c), by placing a true copy thereof enclosed in a sealed envelope, with delivery fees paid or provided for, in a designated area for outgoing overnight mail, addressed as set forth above. In the ordinary course of business at the Law Offices of Merrill, Arnone & Jones, LLP, mail placed in that designated area is picked up that same day for delivery the following business day.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 1, 2020 at Santa Rosa, California.

Jacqueline Schaap

Jacqueline Schaap



Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 12 of 58

# EXHIBIT 2 TO DECLARATION

# OF ROSS B. JONES

**Amended Final Statement of Decision filed in Sonoma County Case No. SCV-264723**

THE HONORABLE BRADFORD DEMEO
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
3035 Cleveland Avenue
Santa Rosa, CA 95403
Telephone: (707) 521-6725

FILED
NOV 08 2023
SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA
BY [signature] DEPUTY CLERK

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SONOMA**

DAVID ADDINGTON, an individual; and PINER PARTNERS, a California general partnership,

Plaintiffs,

vs.

RIDGEWAY DISTRIBUTION, LLC, a California registered limited liability company; VIRGINIA PASINI, an individual; ANTHONY PIZZARELLI, an individual; NACC, INC., a California corporation; and DOES 1 to 50,

Defendants.

/

AND RELATED CROSS-ACTIONS.

/

Case No. SCV-264723

**AMENDED FINAL STATEMENT OF DECISION**

The above matter came on calendar for court trial on May 3-5, 10-12, 16-19, and 23-25, 2023, in Department 17 of the above-captioned court, the Honorable Bradford DeMeo, presiding. Plaintiffs/Cross-Defendants, David Addington and Piner Partners, and Defendants California Champ, LLC and TBKCA, LLC (hereinafter "Addington"), appeared with their attorney, Peter W. Craigie[1]; Defendant/Cross-Complainant, Ridgeway Distribution, LLC, and Defendants, Anthony Pizzarelli and NACC, Inc. (hereinafter "the Ridgeway Parties"), appeared with their attorney, Edwin Bradley; and Defendants/Cross-Complainants, Humbolt Growers Network, Inc., Steve

[1] Plaintiff/Cross-Defendant David Addington filed a Substitution of Attorney on May 12, 2023, substituting Mr. Craigie out as counsel of record and proceeding to represent himself for the rest of the trial.


Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 14 of 58

Dodge, and Tobias Dodge (hereinafter "HGN" or "Humboldt" collectively), appeared by their attorney, Ross Jones.

This Statement of Decision addresses the factual and legal issues identified in the pleadings filed in this matter.

**CREDIBILITY OF WITNESSES**

The credibility of witnesses is one of the important and crucial parts of this trial. The Court listened to all testimony presented. Pursuant to California Evidence Code section 780, the Court will make findings based on the credibility of witnesses and how much weight to be given to their testimony and opinions, as well as evidentiary exhibits received during trial.

David Addington

Some of Mr. Addington's testimony is credible and some is not. The credible testimony helps in developing the full picture of the business relationships among the parties to this action and explains some of their actions. However, his testimony is nuanced in many respects, especially concerning events important to the outcome of this case leading to inconsistent or unsupported conclusions.

John Dixon

John Dixon was clear and had good recall of events as they happened. His testimony appeared accurate and was credible.

Kyle Dixon

Kyle Dixon recalled details of events with confidence. His testimony was credible.

Tobias Dodge

The testimony of Tobias Dodge was credible.

Lizabeth Cader

Ms. Cader's testimony was remarkably accurate regarding the events in this case given her status as a government official who dealt with many different citizens in her capacity for the State. Her testimony did not appear biased and was very straightforward. She was very credible.

Anthony Pizzarelli

Mr. Pizzarelli was credible. He was very involved in the initial stages of the Ridgeway


Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 15 of 58

inception and his testimony was helpful in framing events.

Ian Hardage

Though Mr. Hardage may have given the parties inaccurate guidance and requirements, he admitted that a colleague later gave correct information to the parties in this case. He was credible on the witness stand.

Jarred Martinez

Mr. Martinez was credible.

## I. Introduction

This case brings to mind Aesop's fables of "The Dog And His Shadow", and the "The Bell And The Cat": an individual desire for more, and ideas that seem good, but not executable.

Individual parties Ridgeway Distribution, LLC, Anthony Pizzarelli and NACC are referred to as "the Ridgeway Parties" for ease of reference. David Addington individually and CHAMP are referred to as "Addington". Humboldt Growers Network and the Dodges are referred to as "HGN" or "Humboldt" collectively.

There was a promising, but ultimately disastrous venture between several entities which entered into cooperative agreements for the packaging and distribution of legal cannabis. The potential profit was huge if everyone stayed in their lane. But, as seen in many instances of profit-seeking, the road starts to wind uphill, and some folks cannot maintain their direction.

The beginning was promising. Ridgeway Parties all testified clearly and convincingly that they invited Addington to join the Piner Place project with an optimistic view of each party helping the other succeed. John Dixon, Kyle Dixon, and Anthony Pizzarelli explained that their goal was to move product from producers to retailers. Ridgeway Parties' business model required nothing more than good relations at both ends of the supply chain and a place in which they could receive and then distribute product. Both Dixons and Pizzarelli explained that they hoped and expected Addington would contribute learned skills to build out needed improvements to the Piner Place premises. Pizzarelli also knew that Addington and CHAMP had already started business packaging and labeling marijuana for retailers. Addington testified at some length about his technical innovations in packaging and labeling. As explained by Ridgeway Parties on the witness

stand, Ridgeway's goals combined perfectly with what they understood to be CHAMP's and Addington's business objectives. As Pizzarelli and both Dixons explained, the prospects looked great for each party to succeed by helping the others succeed with no reason for competing against each other. CHAMP packaging product and Ridgeway distributing the packages had the makings of a profitable life.

For a short time, it appears the parties were making money. Unfortunately, Piner Partners saw its shadow. Where all of this changed is when Addington began expanding his operations in Piner Place under the guise of complying with State Cannabis Control requirements for "contiguous space" for each licensee. What Addington learned during this period was that for him to be a legal packager of marijuana, he must also hold a valid distribution license, which he did not prior to coming to Piner Place. Addington's space requirements for personnel and packaging machines combined with the "contiguous space" strictures imposed by state licensing meant that Addington and CHAMP needed to modify the arrangements between all parties located at Piner Place. Addington's plan put everyone else at a disadvantage and decreased their access to portions of the premises such that they could not continue to operate effectively. Unfortunately, despite reasonable alternatives presented by Dodge for reconfiguration of the premises, Addington tried to put the bell on the cat, made things worse, and ultimately the whole cooperative venture failed.

## <u>Evidence, Testimony, and Analysis</u>

### I. Claims

#### A. Addington Claims Against Ridgeway Distribution, LLC, Anthony Pizzarelli and NACC

In this section of this decision, individual parties Ridgeway Distribution, LLC, Anthony Pizzarelli and NACC are referred to as "the Ridgeway Parties" for ease of reference. Of Addington's claims brought to trial, all that remain against Ridgeway Parties are: Breach of Partnership Agreement (1st), Tortious Interference with Business Relations (4th) and Unfair Business Practices (Bus. & Prof. Code 17200) (5th). Addington sues Pizzarelli and NACC for tortious interference (3rd & 4th) and Unfair Business Practices (5th). In each of these claims Addington fails to establish liability as against any of the Ridgeway Parties.

Plaintiffs' Complaint for damages alleges that Ridgeway Parties are liable in damages for having caused "default" of Piner Partners' lease, and then "terminate" its lease by means of written notices on or about September 25, 2017. (Complaint at 3:14-16.) These allegations purport to form the basis of Plaintiffs' claims. Plaintiffs' 3rd, 4th and 5th causes of action rely on these allegations and on allegations contained within the 2nd Cause of Action for Slander of Title.

Plaintiff's 2nd cause of action for Slander of Title, however, was stricken from the Complaint on November 27, 2019, after a successful motion to strike pursuant to CCP 425.16. This trial court acknowledged and affirmed the striking of the 2nd cause of action in a pretrial motion in limine. Therefore, only the allegations contained within Complaint at 3:14-16 are the actions of which Plaintiffs complain and upon which the proof must be judged. Plaintiffs never sought to amend the Complaint.

## II. Analysis

### A. Addington's Claim Of Tortious Interference With Business Relations Fails For Lack Of Evidence Of Wrongful Conduct By Ridgeway Distribution, LLC, Anthony Pizzarelli Or NACC.

To prevail on this claim, Addington must prove all of the following:

1. That David Addington and third parties were in an economic relationship that probably would have resulted in an economic benefit to Plaintiff;
2. That Ridgeway knew of the relationship;
3. That Ridgeway engaged in wrongful conduct;
4. That by engaging in this conduct, Ridgeway intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur;
5. That the relationship was disrupted;
6. That Addington was harmed; and
7. That Ridgeway Distribution LLC's conduct was a substantial factor in causing Addington or Piner Partners harm.

The evidence at trial shows that Addington has not met his burden of proof as to several required elements of the tort.

Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 18 of 58

Plaintiff David Addington brought this action in his personal capacity (Complaint for Damages). However, Addington offered no evidence at trial that he had a business relationship in his personal capacity with any third party. To the contrary, trial evidence establishes beyond question that Addington engaged in the marijuana business as an agent of Piner Partners, a California Company and CHAMP. Addington seems not to have engaged in any business as David Addington, the individual. For example, as regards Addington's involvement in the Piner Lease, whatever that involvement actually was, he conceded on cross-examination that he refused to give the landlord his personal guarantee for lease obligations and stayed free of entanglements as an individual.

Addington has offered no substantial evidence of item 3, that Ridgeway Parties engaged in any wrongful conduct. This tort requires evidence of interfering conduct that is wrongful by some legal standard other than the act itself. The conduct must fall outside of the privilege of fair competition and business practices. *Della Penna v. Toyota Motor Sales, USA* (1995) 11 Cal.4th 376, 393; see *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579,603. Whether the conduct alleged to be wrongful qualifies as wrongful if proven or falls within the privilege of fair competition is resolved by this court, as a matter of law.

Addington failed to offer sufficient evidence that anyone acting on behalf of Ridgeway Distribution, or any defendant at all, engaged in conduct that was *per se* wrongful against him. Without this element, Addington has not stated a tortious interference claim against this defendant.

Testimony and evidence that Ridgeway communicated with the Fire Marshall does not rise to the level of wrongful conduct. Hardage's testimony was informed and sincere in his belief that a sprinkler system was required owing to the special circumstances of the cannabis dispensary and the change of use from the prior tenancy. The evidence was clear that Fire Marshal Ian Hardage did in fact tell Ridgeway personnel that occupancy was not permitted. Ridgeway reasonably relied on this information as it came from a public official with authority.

That Addington continued to fight with the local authorities over this issue and eventually forced a subsequent fire official to relinquish does not alter the fact that Ridgeway Parties had been informed by Fire Marshal Hardage that occupancy was not permitted in Piner Place. Discussing

and reporting this event to others is by no standard wrongful in and of itself.

Among other matters, John Dixon, manager of Ridgeway, LLC, testified that his family's first venture into the semi-legal business of selling marijuana along with the fact that he had invested substantial sums of money in the project compelled him to be especially careful about complying with the reasonable, facially legitimate, directives from regulators, including the State of California cannabis control office and local building and fire officials. Dixon testified that everyone at Piner Place's ability to move from temporary to annual cannabis licenses from the State of California depended upon their business remaining in compliance with all local ordinances.

In the Complaint, Plaintiffs plead that Ridgeway was the master lease holder (3:9) and that Piner GP was a subtenant of Ridgeway under a written sublease. (Complaint, 3:12-13).

Facts pleaded by a party constitute an admission of the fact pleaded. A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions of the truth of a matter and have the effect of removing it from the issues. *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 149; *Smith v. Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259, 269. An admission in the pleadings forbids the consideration of evidence which tends to refute the admitted fact. Any discussion of the evidence is therefore irrelevant and immaterial. *Dressler v. Johnston* (1933) 131 2 Cal.App. 690, 695.

The evidence does not support Addington's trial contentions. John Dixon, his son, Kyle Dixon, and Anthony Pizzarelli all testified convincingly that finding Piner Place was a huge score that came after an extended regional search. Addington himself conceded the value of the lease asset on the witness stand when he confirmed that he agreed with John Dixon's refusal to contribute anything more than the lease to the partnership with Addington.

The "CONFIDENTIAL & PROPRIETARY Commercial Sublease" (Exhibit 10) was no more than a sublease. The parties' disputed evidence leaves the Court balancing the evidence of the party with the burden of proof.

Mutual consent and a meeting of the minds is an essential element of a contract. Cal. Civil

Code 1550(2). *HM DG, Inc., v. Amini* (2013) 219 Cal.App.4th 1100. There is no contract until there has been a meeting of the minds on all material points. *American Employers Group, Inc. v. Employment Development Dept.* (2007) 154 Cal.App. 4th 836. The evidence at trial in the form of testimony by the managers of Ridgeway, LLC, Mr. Dixon and Mr. Pizzarelli, taken with the conflicting terms of Exhibit 10 and Addington's testimony plainly demonstrate that what David Addington had in mind is not what Ridgeway had in mind when it signed Exhibit 10.

Addington's testimony concerning the CONFIDENTIAL & PROPRIETARY Commercial Sublease is inconsistent with other testimony. He testified that there was a tacit understanding that the CONFIDENTIAL & PROPRIETARY Commercial Sublease was actually a full assignment of the Master Lease. Nowhere in the document does it expressly say it is an assignment of the master lease in full. Ridgeway denies such intent and their witnesses are credible. Specific language in the CONSENT TO SUB LEASE [sic] (Exhibit 7) indicates that the Master Lessee, Ridgeway, and the Lease Guarantor, remained obligated to the Lessor. In Paragraph 2. of the Consent a portion of the sublease document reads in part, "(iii) Neither Master Lessee nor its Guarantors are relieved of any lease obligations, except as stated herein. Notwithstanding the indemnification provisions below, Sub-Lessee, Master Lessee, and Guarantors of Master Lessee, hereby acknowledge and agree for the benefit of Landlord, that any default, breach or violation of any provision of the Lease by either Sub-Leasee or Master Lessee constitutes a default under the Lease and *Landlord may proceed directly against Guarantors of Master Lessee, Master Lessee*, the Sub-Lessee and or principle [sic] partners of Sub-Lessee." (Emphasis added.) The CONSENT TO SUB LEASE was appended to the CONFIDENTIAL & PROPRIETARY Commercial Sublease (Exhibit 10). This evidence contradicts Addington's assertion that the other parties had the same intent and understanding, that the parties had a meeting of the minds. It is outweighed by the testimony of other witnesses. The clearest inference to be drawn from the evidence is that a sublease resulted, and not a full assignment.

John Dixon's and Anthony Pizzarelli's testimony proves that each was very clear on two important factors in determining this question. First, both Ridgeway managers were very clear as to the value of their lease with the owner of Piner Place. As of the signing of Exhibit 10, which is

titled as a "sublease", the Ridgeway managers plainly understood it to be a "sublease". The document described its own legal effect as a "consent to sublease" (Exhibit 10, top of page, Passini, 0126). The document also expressly excludes the possibility of construing Landlord's consent to *sublease* as Landlord's consent to "a transfer or assignment of Master Lease to sub-Lessee" (Ex. 10, Passini, 00128.)

Based on the evidence, the Court concludes that Ridgeway never shared Addington's concept of obtaining total superior rights over the lease. There's no reason to believe that Ridgeway knew or intended that Exhibit 10 would serve to relieve Ridgeway of its most valuable asset in favor of a yet unknown business partner who, according to both Dixon and Pizzarelli was already raising mild alarm bells with Ridgeway management.

After Addington took physical control over the leased premises, Dixon had no reasonable alternative to enlisting the help of the Piner Place landlord in an effort to prevent the loss of his investment. Exhibits 15 through 29 document Ridgeway Parties' reasonable and justifiable effort to prevent Addington's hostile takeover. Each of these efforts is a reasonable, lawful response.

There is no evidence of *wrongful conduct per se* by Ridgeway Parties to be found in Exhibits 15 through 29, or in any other evidence in the record.

The necessary predicate to a finding of tortious interference is an act independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard. An act must be wrongful by some legal measure, rather than merely a product of an improper but lawful purpose or motive. *San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1544. In a concurring opinion in support of the *Della Penna v. Toyota Motor Sales, U.S.A, Inc., supra,* 11 Cal.4th 376, Justice Mosk urged that the proscribed conduct be limited to means that are independently tortious or a restraint of trade. Commonly accepted bases for the wrongful act element of tortious interference claims include conduct that is independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trademark infringement. *PMC, Inc., supra,* 45 Cal.App. 4th at 603.

Addington failed to satisfy his burden of proof for this cause of action. On that basis

Plaintiffs' claims found in the third and fourth causes of action fail as a matter of law.

Plaintiff David Addington did not prove the existence of any economic relationship between himself and a third party. But even if he had, he proved no facts to establish that any defendant intended to disrupt Addington's relationship. Nor has Piner Partners established such claim.

Evidence at trial focused on several intersections of business activities between Ridgeway, Pizzarelli and NACC. These intersections joined Ridgway, CHAMP, Piner Partners, the Piner Place Landlord, defendant Humboldt Growers Network, the City of Santa Rosa including fire department officials, and regulators at the department of cannabis control. In each of these realms, the Ridgeway defendants had their own, compelling reasons to engage and interact with each other. Addington proved no actions by the Ridgeway defendants during these engagements that rises to the level of intentional efforts to disrupt relationships that David Addington claims he had but did not prove.

Ridgeway and Pizzarelli each offered reasonable and compelling evidence justifying their interactions with Piner Partners, the other tenants in the Piner Place premises, and the Piner Place landlord. These defendants were actively involved in starting a distribution business in the newly legalized field of marijuana distribution. Engagement with City officials and state regulators was foisted upon all of the parties to this lawsuit and cooperation was obligatory. Ridgway Parties' interactions with the Piner Place landlord were necessary to doing business. Addington's claim to have taken over a lease where the evidence showed the landlord never gave the required consent to assignment caused confusion for everyone.

The parties to this action stipulated that the subsequent, unforeseen downturn in the "legal" cannabis market made it effectively impossible to prove lost profits. No one knew that at the time, of course, but hindsight is often most clear.

The *substantial factor* preventing financial gain in the legal cannabis industry results from a highly regulated and over-taxed market that seems unable to support "legal" distributors who still compete with extra-legal distributors. None of this is attributable to any conduct by Ridgeway defendants, much less wrongful conduct by them. For this reason, too, Addington's claim must

fail.

Ridgeway Parties alleges several affirmative defenses that are amply supported by the evidence in this case as argued more fully above.

Failure to State a Claim (1st), Estoppel (4th), Breach by Plaintiff (5th), Unclean Hands (9th), Fraud (10th), Mistake (13th), Negligent Misrepresentation (11th), and Offset (19th). All of these affirmative defenses afford Ridgeway Parties effective protection from Plaintiff's claims.

**B. Addington Has Not Proved A Violation Of Business And Professions Code 17200.**

Plaintiffs' proof is not sufficient to support his fifth cause of action.

The Unfair Competition Law, "UCL" (Business and Profession Code Section 17200 *et seq.*) "governs 'anti-competitive business practices,' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.'" *Cel-Tech, supra,* 20 Cal.4th at 180, citing *Barquis v. Merchants Collection Assn.,* (1972) 7 Cal.3d 94, 110.

"A UCL action is equitable in nature; damages cannot be recovered. Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provisions. Under the UCL, prevailing plaintiffs are generally limited to injunctive relief and restitution." *Bradstreet v. Wong* (2008) 161 Cal.App.4th 1440, 1458[2]. "The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'" *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 252, citing *Kasky v. Nike, Inc.* 22 (2002) 27 Cal.4th 939, 949[3].

"Civil penalties may be assessed in public unfair competition actions, but the law contains no criminal provisions. We have stated that under the UCL, 'prevailing plaintiffs are generally

---

[2] "Although it is well established that an owner or officer of a corporation may be individually liable under the UCL if he or she actively and directly participates in the unfair business practice, it does not necessarily follow that all of the remedies imposed with respect to the corporation are equally applicable to the individual." (*Bradstreet v. Wong, supra,* 161 Cal.App.4th at 1458.)

[3] The UCL borrows violations from other laws by making them independently actionable as unfair competitive practices, but it does not borrow remedies from those laws. In enacting the UCL, the overarching legislative concern was to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition. Consistent with this objective, the UCL provides only for equitable remedies. *People v. Gabriel* (2010) 186 Cal.App.4th 882, 889.

limited to injunctive relief and restitution.'" *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134 1144, citing *Cel-Tech, supra,* 20 Cal.4th at 179.)

Under the UCL, "the equitable powers of a court are to be used to 'prevent' practices that constitute unfair competition and to 'restore to any person in interest' any money or property acquired through unfair practices." Accordingly, "attorney fees and damages, including punitive damages, are not available under the UCL…. A court cannot, under the equitable powers of [Business and Profession Code] section 17203, award whatever form of monetary relief it believes might deter unfair practices." (*Korea Supply Co., supra,* 29 Cal.4th at 1148.) Thus, for example, fines are not recoverable under the UCL or under the false advertising laws. (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385.)

An action under the UCL "'is not an all-purpose substitute for a tort or contract action. Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit *to prevent unfair business practices* and restore money or property to victims of these practices. As we have said, the 'overarching legislative concern was to provide a stream-lined procedure for the prevention of ongoing or threatened acts of unfair competition. Because of this objective, the remedies provided are limited." (*Korea Supply Co., supra,* 29 Cal.4th at 1150, internal citations omitted; emphasis supplied.)[4]

Business and Professions Code Section 17200 is written in the disjunctive. It establishes "three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech, supra,* 20 Cal.4th at 180; and see *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147. "By proscribing 'any unlawful' business act or practice [citation], the UCL '"borrows"' rules set out in other laws and makes violations of those rules independently actionable." *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370. A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Berryman v. Merit Properties Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.

In *Cel-Tech*, the Supreme Court, "in order to guide courts and the business community

---

[4] "Restitution is limited to restoring money or property to direct victims of an unfair practice." *Korea Supply Co., supra,* 29 Cal.4th at 1151.

adequately and to promote consumer protection" ruled "that any finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation ***of an antitrust law*** or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech, supra,* 20 Cal.4th at 186-187, emphasis supplied.

Addington's evidence affords no basis for this Court to fashion any injunctive relief or to award restitution for ill-gotten gains under the broad, specialized powers of Business and Professions Code Section 17200. This cause of action fails, and no relief awarded based on the status of the proof at trial.

**C. Ridgeway Distribution, LLC's Cross-Claims Against David Addington And California Champ And Piner Partners.**

Ridgway Distribution, LLC claims Addington led it to an early demise but as the parties agree, the Cannabis industry ain't what it used to be. As the unfortunate saga outlined above indicates, Misguided actions by Addington and his entities CHAMP and Piner Partners resulted in lost opportunity for everyone.

Exhibits 9 and 9a, the Memorandum of Understanding between Ridgeway, LLC and Piner Partners, evidences the agreement entered into by these parties on or around June 20, 2017. The terms of this agreement were confirmed by and correspond with the testimony of both John Dixon and David Addington. Each witness adopted the document and explained its provenance and purpose.

In addition to a telling reference to the parties' intention that Ridgeway would sublease to Piner Partners and not assign lease rights, the parties' Memorandum of Understanding expressly specifies in paragraph 4 what Ridgeway, LLC agreed and was obligated to contribute for the joint venture. As originally written by Addington, Paragraph 5 states that Ridgeway will make "total project payments" in the amount of $120,000.00. This term plainly intended to and did define what

Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 26 of 58

Ridgeway, LLC would owe to the partnership in terms of "total project payments."

Both John Dixon and Addington testified that when they met and when they signed this document, Dixon declined to make any further contributions to the "project" other than contributing the prime lease for Piner Place. On the witness stand John authenticated the MOU at Exhibit 9 and identified his own ink pen strikeout of the $120,000.00 figure. Aside from monthly rent for Ridgeway's workspace, the sublease was Ridgeway's "total contribution" to the Project. Under cross-examination David Addington conceded the truth of John's claim and corroborated his testimony by saying, "and I agreed," referring to Dixon's strikeout.

In addition to Dixon's revision of paragraph 5, Addington as a manager of Piner Partners agreed to build a distribution hub for six total distributors, to oversee build-out of distributor's spaces, to prepare documentation necessary for regulatory compliance, and to "operate 947 Piner Place in a professional manner in every respect." (Exhibit 9a, paragraphs 5, 6, 7, and 8.) As the evidence adduced at trial shows, Addington in his official role failed to abide by the agreed terms with Ridgeway, LLC.

Addington, as manager of Piner Partners not only failed to perform as promised, by his actions he *scorned* his obligations to build out the hub for use by six cannabis distributors and his obligation to "endeavor to operate 947 Piner Place in a professional manner in every respect." As the testimony of all Ridgeway Parties confirms, Addington attempted to establish CHAMP, LLC as the primary tenant and to shut off each of the subtenants into untenable workspaces that neither Ridgeway nor Humboldt Growers Network (HGN) could use for business operations. Tobias Dodge testified about the faults of Addington's design at considerable and convincing length.

Addington's interactions with regulatory and life safety officials, as testified to by both Fire Marshal Hardage and by Lisabeth Cader of the State Cannabis Control Department, set a continuing tone for anything but professional operations at 947 Piner Place. Addington continued adamant refusal to reconsider his own interpretation of the "contiguous space" issue when Ms. Cader made it clear that cannabis could not be handled in spaces that were under the control of more than one licensee. Addington's refusal to consider the workable and licensable design prepared by Steven Dodge of HGN (**Exhibit 120**) raises the inference of Addington's consistent

failure to honor his obligation as the manager of Piner Partners.

These actions constitute cross-defendants Addington and Piner Parner's breach of the Partnership Agreement with Ridgeway. These actions and failures also support finding in Ridgeway's favor on the related claims of breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and tortious interference with contractual relations. Given the parties' retrospective understanding that lost profits are not to be had in this sorry affair, the Court can offset any damages claimed by Plaintiffs with the manifest harm caused by Plaintiffs and cross-defendants' own breaches.

**1. Breach of Agreement to Pay Rent.**

John Dixon testified that Piner Partners assumed the obligation to pay rent for 947 Piner Place after entering the agreement at Exhibit 9 and before the landlord would accept rent from Piner Partners. Dixon testified that these payments were owed to Mrs. Passini under the prime lease for 947 Piner Place.

Dixon testified that he and Addington agreed that Ridgeway would pay the rent for 947 Piner Place while they perfected Piner's ability to pay rent directly to the landlord. Based on that understanding, Dixon tendered nine rent payments to Mrs. Passini that were owed by Addington and Piner Place during the period of May through September 2017. These checks are found at Exhibits 152 through 155. These rent payments by Ridgeway, amount to $58,006.50. John Dixon testified that this sum is owed to Ridgeway as being paid by Ridgeway to preserve the parties' standing under the Piner Place lease that gave occupancy rights to all of the tenants.

Based on this evidence, the Court awards damages in the sum of $58,006.50 as evidenced by the check images in Exhibits 152 through 155.

**III. Conclusion**

The evidence in this case establishes that David Addington, individually and as manager of Piner Partners, California CHAMP, LLC, TBKCA, LLC breached agreements with Ridgeway Distribution, LLC. No one continues to pursue the Ridgeway middle-man distribution enterprise owing to Addington's misconduct and to then unforeseen changes in the legal cannabis market. But Addington's conduct has consequences, and he has caused considerable harm to people who

shook his hand in good faith with high hopes of helping each other succeed in a new venture.

Ridgeway Distribution, LLC has proved that it meant no harm to Addington or to any of his business entities. Ridgeway has proved that it had good reason to believe that its business model for moving product between growers and retailers would perfectly fit with Addington's claim of intending to develop a packaging and labeling business.

## IV. DODGE AND HUMBOLDT GROWERS NETWORK FACTUAL BACKGROUND.

David Addington—through his entity Piner Partners--took $100,000 from Tobias Dodge "to improve 947 Piner Place so it will be able to operate as a distribution hub." (Exh. 3A, Sub-Lease, Art. III). Addington told Tobias in writing they were building a facility where distributors could "share space and equipment." Addington represented the same thing to the City of Santa Rosa in its Zoning Clearance application. (Exh. 102). Piner Partners charged $4,000 monthly rent plus 1/6th of the building common-area expenses, so Tobias/Humboldt could operate in what Addington described as a "We Work" shared space environment. Piner Partners contractually promised to use its "best efforts to maintain strict compliance" with all state and local cannabis regulations. (Exh. 3A, Sub-lease, Art. VII.)

The evidence showed what would be called the State's "contiguous space" issue was not on the parties' radar when the Sub-leases were signed. How the parties reacted to the contiguous space issue triggered the events that led to the Cross-complaint.

Tobias and Humboldt continued to fulfill their contractual obligations—Tobias paid the $100,000 move-in fee, and Humboldt continued paying rent. Tobias and Humboldt tried to resolve the contiguous space issue, drawing up floorplans, interacting with the State licensing bureau, and working with the other subtenants. But Addington refused to cooperate with the tenants' efforts to structure the Hub for state-required "contiguous space" laws. He did not fulfill his promises to provide "shared space." When all the sub-tenants came up with a revised facility layout that met regulatory contiguous-space laws—a layout that gave Addington's company CHAMP the largest space and sole control of the refrigerated storage lockers—Humboldt asked Addington if he would agree to it. Addington responded with a one-word email: "No." Exh. 121.

Instead, Addington and Piner took over the facility for his own use. Addington changed the key-pad locks on the interior doors so Tobias and Humboldt could not access over $1 million of their product in the refrigerated storage locker. Addington locked access to the sally port—the only place where cannabis could legally enter and exit the facility—despite his own admission that the State allowed the sally port to serve as shared space. Addington told Tobias that the sally port was part of Addington's own distributorships' (CHAMP) leased space. Addington submitted plans to state regulators claiming the sally port as CHAMP's leased space so he could license virtually the entire building for himself.

Addington, without consent or authority, sold Humboldt's product under Addington's "CHAMP" distributorship, then denied doing so despite photograph proof. Exhs. 18, 145; RT: 1402: 8-25, 1403-1407: 1-2. Addington illegally trimmed raw cannabis in what was supposed to be the shared-space processing area. He physically intimidated the tenants; assaulting Steve Dodge in front of multiple witnesses and slamming his office door in Kyle Dixon's face. Kyle Dixon — RT: 851: 20-25, 852: 1-11. By mid-2019, Addington restricted Humboldt to a 10 x 10-foot office, despite confirming to the State the original intention that "no cannabis activities" would take place in the offices. Exh. 114, p. 2 (email dated March 29, 2018, from Skelsky to B.C.C.: "Suites A-F are offices that will be used for clerical work as well as meetings with potential clients and contacts. They contain desks, phones, security monitors, computers, and internet access. Cannabis activity will not occur in these suites.").

By mid-2019, Humboldt could not legally operate out of the Piner Place facility — they had no access to their product storage, no access to the sally port, and no place to package product. Humboldt was operating without a Santa Rosa permanent occupancy certificate because Addington was fighting with Santa Rosa about fire sprinklers, and without a permanent state cannabis license because Addington claimed virtually the entire facility as his own distributorship. Tobias testified: "We were being told that by the state agents that it was a unlicensed civil facility; that actually no license in that facility was going to be issued if we didn't come to an agreement, reorganize the plan, have a Certificate of Occupancy, all have contiguousness with the sally port, all of those issues were standing in between us and licensing and the clock was running out. We

were getting really scared." RT: 1411: 11-25, 1412: 1-2.

When Tobias told Addington that Piner's restrictions were forcing Humboldt to turn away business, Addington's response boiled down to, "I don't care. We're not going to do anything adjust your space. Just put your orders in, and we'll get to them when we can get to them. And I'm not going to adjust my SOPs regarding chain of custody at all." So, it just got basically impossible to work. RT: 1425: 25; 426: 1-12.

Yet Humboldt — despite being unable to function out of the Piner Place facility — paid Piner Partners $80,000 in rent from March 2019 until October 2021 under constant threat of eviction. Addington put a bike-chain lock on the front door, three days after sending Humboldt an eviction notice. Exhs. 135, 136, RT: 1259: 16-25, 1260: 1-7. Six months later, Addington changed the front door locks days after sending Humboldt another eviction notice, even though Humboldt was paying rent to the court in its Interpleader action. Exh. 138.

Humboldt, left with no other options, opened a duplicate distribution facility remotely located in Humboldt County. Exh. 130. Humboldt spent $600,000 to open the second distributorship (lease payments, tenant improvements, staffing, equipment, and vehicles). RT: 1474: 5-25, 1475-1477: 1-4. Humboldt claims it lost $4 million in sales from not being able to fill orders at Piner Place. RT: 1482: 15-25. 1483: 1-24. In total, Tobias and Humboldt claim $5 million in damages resulting from Addington and Piner Partners' conduct.

Piner Partners breached Articles 3 and 7 of the Hub Subleases with Tobias and Humboldt, and it breached the implied covenant of good faith and fair dealing. Addington and Piner Partners interfered with Tobias and then Humboldt's business relationships.

## V. PINER PARTNERS BREACHED ITS SUB-LEASES WITH TOBIAS AND HUMBOLDT GROWERS NETWORK

### A. The Cause of Action — Elements

Cross-Complainant's First Cause of Action is for **Breach of Contract**. CACI No. 303 describes the Breach of Contract factual elements: 1) plaintiff and defendant entered into a contract; 2) that plaintiff did all, or substantially all, of the significant things that the contract required them to do; 3) that any conditions required for defendant's performance were met, waived

or excused; 4) that the defendant did something the contract prohibited them from doing; 5); that plaintiff was harmed, and; 6) that defendant's breach of contract was a substantial factor in causing the harm. *Ibid.*

CACI No. 325 describes **Breach of the Implied Covenant of Good Faith and Fair Dealing** (see Amended Cross-complaint, Second Cause of Action): "In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract." *Ibid.*

The testimony and evidence prove every element of both the Breach of Contract and Breach of Implied Covenant claims.

**B. Tobias Dodge Entered into a Sub-Lease with Piner Partners, then Entered into a Sub-Lease on Behalf of Humboldt Growers Network, Inc. once Humboldt was Formed in January 2018.**

When Tobias first negotiated a sub-lease with Addington, no legal entity had been formed — as Tobias and his father Steve were still operating under the medical "collective" model. RT: 1315: 4-25, 1316: 1-7. Addington sent Tobias a "move-in packet" that contained an NDA (Exh.106) and a template Hub Sub-lease with the tenant's name left blank "as some of you are still deciding on entity types and names." *Ibid*, Exh.103.

Tobias arranged to meet Addington at the facility on November 1, 2017, to sign the Sub-Lease because their mutual lawyer (Greg Anton) would be the facility; contemporaneous emails exchanged between Tobias and Addington confirm these facts. 16 Exh. 105.

Tobias testified he met Addington and Anton at the facility on November 1st, paid Addington $100,000, and signed both the NDA and the Hub Sub-Lease as an individual. Exh. 3A, RT: 1346:9-12; 1350: 6-25, 1351: 1-14 (signed sub-lease); 1347: 10-25, 1348: 1-9, Exh. 106 (signed NDA). Addington confirmed that Tobias personally paid Addington the $100,000 "move-

in fee" in cash. *Id*, at 375:5-14. Tobias told Addington that Humboldt did not yet exist, it would be formed later: "We made it clear that we had a collective that was the Humboldt Growers Collective and that we would immediately form a corporation." RT: 1360: 14-23. Two months later in January 2018, once Humboldt Growers Network, Inc. was formed, Tobias signed a second Sub-Lease on Humboldt's behalf with Piner Partners, drafted by Addington (backdated to November 1, 2017). Exh.11, RT: 1364: 11-25, 1365: 1-24. Tobias explained he'd received legal advice that a corporation should own the distributorship. *Id*, at 1364: 3-15.

Addington denied ever signing a Sub-lease with Tobias.[5] But the evidence shows otherwise: The Tobias/Piner Partners sub-lease matches the "blank" sub-lease Addington emailed Tobias two days earlier, word-for-word. See Exhs. 3A, Exh. 103 (pp. 2-8). The Tobias/Piner Partners sub-lease is identical to the Sub-lease Piner Partners itself signed with Addington's wholly owned distributor California CHAMP (Exh. 108), and the sub-lease signed by sub-tenant AgriCascadia (Exh. 12).

Review of the Tobias/Piner Partners sub-lease and later Humboldt/Piner sub-lease confirm their authenticity. Tobias testified that while the original Hub plan called for each subtenant to pay a $150,000 move-in fee, Tobias and Addington agreed to a $100,000 fee instead. Tobias — RT: 1353: 24-25, 1354: 1-14; Addington — RT: 375: 5-14. Addington also testified that Humboldt, like every other sub-tenant, was supposed to pay 1/6 (or 16.67%) of monthly common-area expenses. RT: 262: 4-25, 263: 1.

The Tobias/Piner Partners sub-lease, consistent with Tobias and Addington's testimony, shows Tobias' hand-written revisions crossing out the $150,000 move-in fee, and instead writing in $100,000. Exh. 3A, Article III; RT: 1353: 3-25, 1354: 1-22. The Tobias/Partner Partners sub-lease also lists the 16.67% share of common-area expenses, consistent with Addington's testimony. *Id*, at Article IV.b.

---

[5] RT: 156:2-7. Addington's counsel tried to make much of the Cross-complaint and Tobias' deposition testimony erroneously thinking the 2019 "contiguous space" diagram was part of the November 2017 Tobias/Piner Partners sub-lease. See Amended Cross-complaint, para.15. Tobias explained at trial that the contiguous-space diagram was in a binder with the leases, zoning clearance and a series of floor plans; the contiguous-space diagram was attached to the sub-lease later "by mistake." RT: 1358: 18-25, 1359: 1-17; 1494:6-22; 1498:4-8; 1499: 5-22, 1502: 13-25, 1503: 1-2. All parties testified the contiguous space issue did not arise until March 2018. Exhs. 112, 114, Tobias--RT: 1374: 4-9; Addington, RT: 121:2-8.

The second lease signed in January 2018 by Tobias on behalf of Humboldt Growers Network, Inc., contains blank spaces regarding both the move-in fee and Humboldt's share of common-area expenses. Exh. 11, Articles III, IV.b. However, those items were already established in the prior Tobias/Piner sublease signed two months earlier. RT: 1361: 3-25, 1362, 1363, 1364: 1-2. Likewise, the Tobias/Piner sub-lease shows a lease term ending October 31, 2026, while the later Humboldt/Piner sub-lease has a blank space for the lease termination date. Exh. 3A, Exh. 11 — Article II.

If — as Addington claims — the Exh. 11 sub-lease is the only sub-lease between the parties, then Piner Partners had no contractual basis to take a $100,000 move-in fee from Tobias or collect one-sixth CAM expenses from Humboldt: The Exh. 11 sub-lease contains no contractual provision for Humboldt to pay a move-in fee or CAM expenses. The logical inference is that the parties deemed the Exh. 3A and Exh. 11 sub-leases in combination as describing their contractual obligations.[6]

**C. The Specific Terms of the Sub-Lease, and the Implied Covenant, Required Piner Partners to Improve the Premises So it Could Legally Operate as a Shared-space Cannabis Distribution Hub in Compliance with Cannabis Laws.**

Addington testified that his vision for the Piner facility was a "We Work" model: "[I] got very interested in the idea of a shared space." RT: 57: 24-25. Addington explained "I could create what I would call plug-and-play distributorships, so allow someone to become a licensee of the state, meeting all the requirements, but without having to go through all of the real estate development and the lease uncertainties and so forth." *Id*, at 58: 1-7. Addington also hoped the model would create built-in customers for his CHAMP packaging and trimming services. RT: 57: 17-25, 58: 1-12.

Addington represented the same thing to Tobias during their "phase one" discussions, both verbally and in the Santa Rosa Zoning Clearance approval that Addington emailed to Tobias before he signed the Sub-lease. Exh. 102; RT: 1304: 16-25, 1305: 1-21: "The conversations with

[6] Whether the two Sub-leases (Exhs. 3A and 11) are viewed as a single contract or a modified contract has no impact on the legal analysis of Piner Partners' breach. See CACI Nos. 302, 313.

Mr. Addington and then particularly, the documents that I got prior to signing which are the original proposal that came from Ridgeway to City of Santa Rosa which I believe is part of the zoning clearance which really clearly lays out a shared space facility, shared packaging spaces, shared equipment use, shared garage, sally port use, and essentially, every part of the facility to be shared." *Ibid.*

The Zoning Clearance — signed by Addington certifying that "all of the submitted information is true and correct" — provides the clearest details of what Addington intended for the "cannabis hub." Exh. 102, p. 5 [HGN 26]. The Zoning Clearance explained in the Project Description Overview: "Our goal is to operate a legally compliant medical cannabis distribution 'hub' in Santa Rosa where up to six <u>distribution companies could share certain secure equipment and facilities</u> without risking safety or quality control." Exh. 102, at p. 6 [HGN 000027] (underlines added). Addington explained the financial model for the Hub: "This proposal seeks to make slight modifications to the interior of the building to create space for up to six different distributor tenants, which will allow smaller distribution companies to share equipment and costs." Id, at p. 10, fn. 1 [HGN 000031].

The Zoning Clearance explicitly represented that each tenant would share the sally port and grading/sorting/packaging areas of the facility: "The existing facility would be divided up into six separate suites and six separate secure temperature-controlled storage areas, each with discrete entrances and exits into the common spaces of the building … <u>The distributor tenants would share the secure 'Sally Port'</u> (described in further detail below) <u>as well as the grading, sorting, and packaging equipment</u> … All shared access rooms will remain separated with operation-based security measures, and will remain locked when not in use." Exh. 102, p. 9 [HGN 000030] (underlines added). The Zoning Clearance detailed that the Sally Port "would essentially be a secure space within the unloading area of the building that shipments would enter and exit through… <u>The Sally Port would be shared by the various distributor tenants in the facility</u>, and this area would remain locked and clean unless appointments were made." *Ibid* (underlines added).

Exhibit 101—a cleaner version of the premises diagram attached to the Zoning Clearance—shows the facility layout. The dark shaded areas constitute the six separate offices and

private refrigerated storage lockers that would be under the tenants' exclusive control. See Zoning Clearance, Exh. 102: "Employees of the various distribution company tenants may only access their office suite, their individualized temperature-controlled storage area, the common restrooms and the shared 'employees-only' restricted areas of the facility using their secure keypad entry. Employees of one tenant would not be able to access the office suite or storage area of any of the other tenants." *Ibid*, at p. 12 [HGN 000033].

The non-shaded areas of Exh. 101—labeled "Processing and Packing," "Sally Port," "Sorting/Grading/Clean Room"—are accessed through what the Zoning Clearance described as "a restricted 'employees-only' hallway. Through this hallway, employees of the distributor tenants will be able to access their company's private secure refrigerated storage space, as well as the processing and packing area located at the back of the facility." Exh. 102, p. 13 [HGN 000034] (emph. in original).

No one disputes that this shared-space model formed the foundation for the "distribution hub" concept and the Sub-leases. The template Sub-lease prepared by Addington states that the move-in fee was to be used "to improve 947 Piner Place so it will be able to operate as a distribution hub." Article III. The same term is contained in Article III of the Tobias/Piner sub-lease; (Exh. 3A), the AgriCascadia sub-lease (Exh. 12), and Addington's own CHAMP/Piner sub-lease (Exh. 108).

The premises diagram in the Zoning Clearance (Exh. 101) emailed by Addington on October 30, 2017 (Exh. 102) is the only diagram showing the distribution hub lay-out as of the sub-lease inception dates (November 2017). The first paragraph of the sub-leases described their leased premises as an office suite: AgriCascadia's premises was "Suite C" (Exh. 12), Humboldt in "Suite D" (Exh. 11), and CHAMP in Suite E (Exh. 108). Ridgeway, which had a separate form of sub-lease with Piner Partners, was in Suite B" (Exh. 10-section III). Each sub-lease referenced a premises diagram, but no such diagram was attached to any of the sub-leases. Id; RT: 1311: 19-25, 1312: 1-2 (no premises diagram attached to blank template sub-lease — Exh. 103); 1365: 5-20 (no premises diagram attached to Piner/Humboldt sub-lease — Exh. 11); RT: 1358: 18-25, 1359: 1-17 (no premises diagram attached to Piner/Tobias sub-lease — Exh. 3A).

The sub-leases require each tenant to pay 16.67% (one-sixth) of the common area expenses (Article III.b.). However, "common area" was not defined in any of the sub-leases. Notably, Piner Partners charged Humboldt for "door and lock replacement" and "re-installation of steel doors" separating the office suite from shared spaces as "common area maintenance" fees. Exh. 135, p. 4 [Bates stamped HGN 153.]

Lastly, the sub-leases imposed a contractual requirement for the parties to "make best efforts to maintain strict compliance with all applicable California state, county and municipal laws and regulations pertaining to cannabis." Sub-lease--Article VII (Exhs. 3A, 11, 12, 108). Tobias was asked whether that provision was important to him: "Very important. Having the opportunity to operate in the regulated cannabis space was really an honor, and we had a lot of respect for not messing up our opportunity." RT: 1467: 5-14. Tobias was asked, as someone with 20 years in the regulated cannabis space, about his experiences seeing the consequences of not being in strict compliance with the rules: "Cannabis operators are -- have a heightened sensitivity to complying with regulation at a very rapid rate. We don't argue with regulators even in the situation where what they're asking you doesn't make any sense, which is common. You just say yes, sir, and you do it as fast as humanly possible, otherwise they take your license and all your money."

**D. Piner Partners Breached Article III of the Sub-Lease-- Requiring Piner Partners to Improve the Premises So it Could Legally Operate as a Shared-space Cannabis Distribution Hub; and Article VII—Requiring Piner Partners to Maintain Strict Compliance with All Cannabis and Regulations. Piner Partners' Conduct Violated the Implied Covenant of Good Faith and Fair Dealing by Making It Impossible for Humboldt to Legally Operate its Distributorship.**

The undisputed evidence showed Tobias paid the move-in fee, Humboldt fulfilled their contractual rent obligations, and Humboldt worked to comply with the state's contiguous-space laws. The undisputed evidence also shows that Addington refused to improve the premises so it could operate as a distribution hub under the State's contiguous-space regulations. To the contrary, by mid-2019—when the subtenants were desperately trying to get their annual State licenses under

threat of closure—Addington claimed that what had universally been agreed-to as shared areas were now part of CHAMP's "leased space." Addington emailed Tobias on August 27, 2019: "The sallyport at 947 is part of California CHAMP's leased area." Exh. 37. See also, Exh. 33, p. 2, Addington email to Tobias dated July 24, 2019: "When we last traded emails, I suggested that you provide me with what documents you might possess that grant you after hours access to the CHAMP sallyport."

Addington did not present any documentary evidence at trial to support his claim that the sally port and other shared spaces were part of CHAMP's leased premises. The CHAMP Sub-Lease, like every other tenant sublease, described its leased premises as an office suite (Suite E in CHAMP's case), and referenced a premises diagram which was not attached to any of the subleases. Exh. 108. When Addington's own counsel asked him "When you're talking about the sally port as part of CHAMP's lease, what are you referring to?" Addington gave a rambling non-responsive answer that was stricken from the record. RT: 1716: 6-25; 1717: 1-25; Exh. 37. When Addington's counsel tried to clarify, asking "Well, was it your understanding that the sally port could be shared space?" Addington admitted: "A. Absolutely, it could have been." RT: 1718: 5-7.

Addington tried to dig himself out of the hole by testifying that "if it was shared space, its functionality would be dramatically impeded." In fact, Addington's solution — to give himself sole control of the sally port — was illegal. Expert witness and State Cannabis Licensing Analyst Elizabeth Cader testified:

> So meaning if that sally port was a common area and there is a path to travel, which it looks like there's a hallway down here that goes over and down to get to the suites, **so if that's a common area, that's not a problem**.
>
> Now, if you're — **now, if this sally port was under somebody's full control because that was part of their licensed premise, then, yes, that's a problem because you cannot pass through one licensed premise to get to another licensed premise**. So that's where the issue — I think one of the big issues came up, if, you know, all the licensees didn't have access to that space as a common area. But, once again, we can't — as the State — can't intervene because that is a business dispute amongst the licensees and the tenants."

RT: 1061:2-21 (bold added).

Cader's trial testimony echoed her contemporaneous e-mail exchange with Ridgeway's

John Dixon on July 25, 2019. Exh. 33, pp. 4-5. Dixon told Cader that Addington "is laying claim to the building's sallyport calling it the CHAMP sallyport. It is my understanding that the sallyport in the building is a shared space. Can you help?" Cader initially responded that that "the Bureau cannot weigh in on your business dispute. You may wish to refer to your lease documents[.]" When Dixon clarified he wasn't looking at it as a lease question, but "I just thought within a licensed cannabis facility the sallyport could be a shared space," Cader replied: "From a licensing standpoint, a loading/unloading zone where no cannabis is stored or processed, could be considered a common use area. Whether or not the businesses in the building all choose to use it that way or whether the loading unloading area is part of one business only is a matter for the tenants and landlord to determine."

Addington did more than just send emails claiming the shared spaces for himself; he changed the key codes so that none of the tenants could access their refrigerated storage, the sally port, or the packaging areas of the premises; Tobias — RT: 1433: 4-25, 1444: 1-21; Kyle Dixon — RT: 891-25, 892:1-23; Pizzarelli — 1259: 2-15, 1264: 22-25, 1265: 1; Exhs. 33, 37. Addington refused to allow the tenants into the shared spaces when Fire Marshall Hardage inspected the building, physically battering Steve Dodge in the process. Kyle Dixon — RT: 868: 11-25: "And so Mr. Dodge started to walk in, and we started to follow him. And David, you know, grabbed Mr. Dodge by the shirt and slammed him into the wall and Mr. Dodge fell over. And then David slammed the door on us with the coded lock that at that time we didn't have a code to and continued on with the meeting." Exh. 24, p. 4 (John Dixon: "While Steve was holding the door for my wife, David put his hand on Steve's chest and shoved Steve across the hallway into the wall.") Addington — 218: 1-22 ("Mr. Dodge decided he was coming now regardless and came into the doorway — tried to come through the doorway, and I'm bigger than Mr. Dodge. I put my hand out to stop him, and it knocked him down.").

Addington rejected every tenant proposal to comply with contiguous-space requirements, even one that gave CHAMP the largest space and sole control of the refrigerated storage. Exhs. 120, 121. Addington's position was that he had sole control of all cannabis product moving through the facility, and the tenants could use CHAMP's packaging services — at inflated rates.

Pizzarelli — RT: 1178:16-25, 1179: 1-10; 1181:21-25; 1182: 1-9: "His [Addington's] view was that we subleased from him small office suites and if we wanted to operate in different parts of the building, we could contract through his business … his standpoint was that legally he didn't have to make any changes, that he was — it was his building." *Ibid.*

Addington also made it impossible for Humboldt to get its state cannabis license. In summer 2019, Tobias and the other tenants discovered that their annual State license applications were being rejected because Addington had submitted his own application showing the sally port and packaging areas as CHAMP's leased space. Tobias — RT, 1389: 16-21: "When David got his packaging equipment, he moved it in there; put in the locks on the doors, shut everybody out; submitted for his premise for the entire building which then precluded anybody from having overlapping premises. It functioned basically as a hostile takeover." Expert witness Cader testified: "And if there are any discrepancies from one licensee to the other, that would cause a flag, and obviously we would ask questions and dig a little further and — but we would not be able to move forward unless all of the licensees in that building were, you know, submitting the same information." RT: 1102: 2-7.

Less than two years earlier, Addington represented to Tobias and the City of Santa Rosa — in writing — that the sally port and packaging areas were shared spaces. Exh. 102. Addington/Piner took $100,000 of Tobias' money to improve the premises for that purpose, as stated in the sub-lease. Exh. 3A, Art. III. Piner agreed in that same sub-lease to maintain strict compliance with all cannabis laws. Piner originally told the State — consistent with the shared-space hub concept — that "no cannabis activities" would take place in the tenants' small offices. Exh. 114, p. 2 (email dated March 29, 2018, from Skelsky to B.C.C.: "Suites A-F are offices that will be used for clerical work as well as meetings with potential clients and contacts. They contain desks, phones, security monitors, computers, and internet access. Cannabis activity will not occur in these suites.")

Instead, Addington's response to the "contiguous space" issue was to take forcible possession of the shared spaces in 2019 — without any contractual basis, and contrary to his obligations under the sub-leases he signed with Tobias and later Humboldt. Tobias testified that

Addington claiming the sally port belonged to CHAMP "would shut down my business. I couldn't work like that." RT: 1446: 8-21.

Piner Partners also acted outside cannabis laws by converting Humboldt's cannabis and selling it under Addington's CHAMP distributorship. Humboldt was forced to report the discrepancy to the BCC, putting Humboldt at risk of cannabis forfeiture and license revocation. Exhs. 18, 145. Tobias testified: "We were actually quite scared. Because at this point, our product was in another premise. And in the cannabis industry, there's a lot of collateral damage. You're standing next to somebody who's doing things the wrong way, and you lose your business because of a proximity or association. This was a really scary situation for us where any inspector could have come in, seen that there was mixed product or no clarity over premises and paperwork not being done, and we generally have about a million dollars' worth of product in the facility, and it could have been confiscated without notice." RT: 1433: 20-25, 1434: 1-7. Tobias raised these concerns to Addington both verbally and in writing. See, Exh. 18; RT: 1434: 8-16.

Humboldt was also worried about CHAMP's illegally trimming raw cannabis in the processing area, testified to by multiple witnesses. Pizzarelli — RT: 1177: 12-25, 1-15: "At that time, David was processing raw cannabis in the back of the building. One is – you know, per state law, especially at the time, it was not allowed."; Kyle Dixon — RT: 875:6-25, 876: 1-4: "We were seeing that, you know, David was, you know, doing business that would be considered illegal by the State, such as processing cannabis, which processing, you know, is defined as, you know, taking the raw, you know, flower that's on the – on the branch, cutting it off the branch, trimming it of all the leaves and other material, and separating that out into whatever, the biomass, and then severing the flower. You know, we actually were not supposed to be processing cannabis as distributors." Tobias — RT: 1434: 17-25, 145: 1-5: "There was an ongoing concern by all parties that there was noncompliant activity happening, that we had no real oversight of that, and it was very likely going to impact our licensing and maybe worse."

Addington — through his companies CHAMP and Piner Partners — engaged in a "hostile takeover" of the facility, ignoring its contractual duties to improve the premises so it could operate as a distribution hub in strict compliance with cannabis laws.

**E. Humboldt Was Harmed by Piner Partner's Breaches; it Had to Open Another Distributorship, Turn Away Business, and Pay Piner Partners' Rent as a Result of Piner's Breaches.**

Tobias testified that by June 2019, Humboldt could no longer operate out of the Piner facility. RT: 1446: 22-25; 1447: 14-24. Humboldt was unable to package cannabis in a 10 x 10-foot office, without secure storage or access to the secured sally port. Tobias was turning away orders because Humboldt could not fill them or deliver in a timely manner. RT: 1441: 23-25, 1442: 1-9.

Faced with no other options, Tobias testified that Humboldt had to locate another distributorship — not an easy task given the lack of available options. RT: 1448: 5-24. Eventually, Tobias found a location in Humboldt County in Phillipsville — four hours north of the Piner Place facility. Tobias described the problems having to operate from such a remote location:

> Well, it put us -- it's a four-hour drive, which puts you at an eight- to ten-hour workday away. So if we're packaging an order for a San Francisco store in Humboldt County, we would have to do it ahead of time; right? You couldn't do it day of. So it made deliveries delayed. And I've already described that you can't be late on these deliveries, much like any business. So we had to actually buy more vans. We had to hire more people. We had to hire another staff. We had to outfit an entire distributorship. And then we would lose minimum of an eight-hour paid day for every single order.
>
> Q. Was this something that you were looking forward to doing?
>
> A. Absolutely not. This was a worst-case scenario for us.
>
> Q. Did you feel like you had any other options at this point?
>
> A. We didn't have any other options at this point, no."

RT: 1449: 4-25.

Steve and Tobias Dodge, both individually and on behalf of Humboldt, signed a two-year lease for the Phillipsville location. Exh. 130. Tobias testified he reviewed Humboldt's QuickBooks, payroll records, and receipts to verify that Humboldt spent $600,000 building and operating the Phillipsville distributorship; the largest costs being staffing, insurance, vehicles and rent. RT: 1474: 5-25, 1475-1477: 1-4. Addington unwittingly confirmed the high costs of opening

the distributorship while he was cross-examining Tobias: "[MR. ADDINGTON:] So you testified earlier you had spent about $600,000 to get your distro up and running in Humboldt; is that correct? A. Yes. Q. [MR. ADDINGTON:] It's expensive to get a distro." RT: 1572:24-25, 1573: 1-3.

Tobias testified that Humboldt generated $150,000 per month in profits once the second distributorship opened. RT: 1478-1483:1-24. Tobias testified that Humbolt's profits were reduced by half with the COVID pandemic. RT: 1482: 15-22.

Humboldt turned away business because it could not handle any more processing and packaging at the second facility. Humboldt would have made the same profit at the Piner Place facility if Humboldt had been able to use it as originally intended RT: 1482: 23-25, 1483: 1-24.

> Q. So were there particular instances where you found yourself unable to fill orders?
>
> A. Yes. Regularly.
>
> Q. Do you have any estimate of the volume of those orders or the amount of money that you would have made from those orders had you been able to utilize the Piner facility?
>
> A. Yeah. It would have been 2 to 2.5 million a year.
>
> Q. In gross?
>
> A. In gross.
>
> Q. Okay. And what would the net have computed on that?
>
> A. It would have been a very similar $150,000 a month net.
>
> RT: 1483: 10-24.

Below is a chart of damages by category. The Court notes that pre-Covid losses are more certain that potential losses during the pandemic and after. The Court finds that the requested damages in lost profits from April 2020 to present are too speculative.

//

//

//

| Category: | Amount: | Record: |
| --- | --- | --- |
| **Move-in fee** paid by Tobias to improve premises "so it will be able to operate as a distribution hub" | **$100,000** | RT: 1463:23-25, 1464, 1465, 1466:1-17. |
| | | |
| **Rent** paid by Humboldt to Piner Partners for 947 Piner Place from March 2019 to October 2021. | **$80,000** | RT: 1471: 16-25, 1472: 1- 24; RJN, Exhs. C, D, F. |
| | | |
| **Second Distributorship** in Humboldt County, total: | **$600,000** | RT: 1477: 1-11 |
| Major categories: | | |
| Rent-$1,500/month from June 2019 to September 2022 (40 months) | $60,000 | RT: 1473: 2-25, 1474: 1-3. Exh. 130. |
| Employee staffing | $200,000 | RT: 1474: 5-25, 1475: 1-4. |
| Two transport vans | $125,000 | RT: 1475: 7-25, 1476: 1-3. |
| Security | $10,000 | RT: 1476: 4-10. |
| HVAC | $7,000 | RT: 1476: 4-10. |
| Furniture, equipment | $37,000 | RT: 1476: 24-25, 1477: 1. |
| | | |
| **Lost Profits** from Turned-away Orders: | **$1,800,000** | RT: 1477:12-25, 1478-1483:1-24. |
| Pre-COVID ($150,000/month March 2019-March 2020) | $1,800,000 | RT: 1482: 1-25; 1483: 1-25. |
| | | |
| **TOTAL:** | **$2,580,000** | |

## VI. DAVID ADDINGTON AND PINER PARTNERS INTERFERED WITH TOBIAS DODGE AND HUMBOLDT GROWERS NETWORK'S BUSINESS RELATIONSHIPS

### A. The Cause of Action — Elements

Cross-Complainant's Third Cause of Action is for **Interference with Economic Relations**.

CACI No. 2202 describes the Intentional Interference with Prospective Business Relations factual elements: 1) plaintiff and a third party were in an economic relationship that probably would have resulted in an economic benefit to plaintiff; 2) that defendant knew of the relationship; 3) that defendant engaged in specified conduct determined by the court to be wrongful; 4) that by engaging in the conduct, defendant intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur; 5) that the relationship was disrupted; 6); that plaintiff was harmed; and 7) that defendant's conduct was a substantial factor in causing plaintiff's harm. *Ibid.* The testimony and evidence proves every element of the claim.

**B. Tobias Dodge and the Later-formed Humboldt Growers Network Were in Economic Relationships with Retail Cannabis Dispensaries.**

Tobias testified that he and his father started a collective[7] 20 years ago in the Prop. 215 medical cannabis era, where they "farmed and distributed to Bay Area stores up until the time we converted to a cannabis license under Proposition 64." RT: 1300: 15-25, 1301: 1-17. Tobias described it as a "vertical cannabis" operation where they created their own genetics, operated their own commercial nursery at several farms in Humboldt County, then transported and distributed their cannabis to dispensaries in San Francisco. *Id*, at 1301: 18-25, 1302: 1-23. Once Humboldt Growers Network, Inc. formed in January 2018, the business continued to grow. RT: 1368: 9-25, 369: 1-12; Exh. 13.

**C. Addington Knew About These Economic Relationships with Retail Cannabis Dispensaries.**

Tobias testified that in his initial meetings with Addington, Tobias told Addington about his farms in Humboldt County, and that he had existing relationships with dispensaries in San Francisco. RT: 1307: 19-25, 1308: 1-25, 1309: 1. Tobias described Addington's response: "Well, he was very excited and he thought I fit the, you know, the mold for the kind of — or the profile of the kind of person he wanted in there." *Id*, at 1308: 10-12.

Addington knew during these pre-lease discussions — which Tobias described as "Phase

---

[7] The former medical cannabis laws provided a structure where marijuana patients and their primary caregivers formed "collectives" to cultivate marijuana. Health & Safety Code §11362.775.

1" of the relationship — that Tobias had not yet formed a legal entity. See Exh. 103, Addington email dated October 30, 2017: "As some of you are still deciding on entity types and names, I am circulating a blank [form lease]." RT: 1315, 4-14. Tobias confirmed the same. *Ibid*, 1315: 22-25, 1316: 1-7: "We were still the Humboldt Growers Collective, and were forming the corporation at the time.

Q. Okay. So specifically, did you discuss with Mr. Addington that what is now known as Humboldt Growers Network, Inc., a corporation, was an entity to be formed at some point in the future?

A. Yes, I did." Indeed, Tobias as an individual was party to the original November 1, 2017, sub-lease with Piner Partners (Exh. 3A) and the Non-disclosure Agreement (Exh. 106).

**D. Addington Engaged in Wrongful Conduct.**

Per CACI, "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. … Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trademark infringement." CACI No. 2022, Sources and Authority, at p. 1319.

Addington and Piner Partners' conduct was independently wrongful on multiple grounds. As described above, Piner Partners breached specific provisions of its sub-leases with Tobias and Humboldt Growers, and the implied covenant of good faith and fair dealing. Addington and Piner Partners also committed conversion — they prevented Humboldt from having access to its $1 million of cannabis by placing it behind keypad locked steel doors, and sold Humboldt's cannabis under the CHAMP brand without consent, payment or documentation. See CACI 2100 (Conversion-Essential Factual Elements).

Addington and Piner committed trespass — they wrongfully excluded Humboldt from use of the sally port, processing and packaging areas by Addington making the unsupported claim that they were part of CHAMP's leased space and locking Humboldt out of the premises. CACI No. 2000. Addington committed trespass by locking Humboldt out of the entire building — by putting

on a chain-lock on the front door, then changing the front door locks after posting eviction notices. Exhs. 135, 136, 138. Addington committed battery on Steve Dodge in front of multiple witnesses. CACI No. 1300.

**E. Addington Intended to Disrupt the Relationships or Knew that Disruption of the Relationships Were Certain or Substantially Certain to Occur.**

As described above, multiple sub-tenants testified they could not legally operate without access to their storage lockers, packaging areas and sally port. Tobias: "We continually informed David that it wasn't working, we weren't making our deadlines, we were losing our accounts, and we were just — weren't — the process wasn't working for us and we needed to have more space so that we could do our own packaging and make our own deadlines." RT: 1425: 18-24. Anthony Pizzarelli testified that at a March 2019 hub meeting, Addington told the tenants, "it was his building" and "and if we wanted to operate in different parts of the building, we could contract through his business." *Id*, at 1181: 16-25, 1182: 1-9. Pizzarelli described Addington's ultimatum to the sub-tenants: They could use Addington's own CHAMP packaging services (at inflated prices) or find outside packaging service: "We had a hub meeting with different tenants there — Kyle Dixon, Tobias, AGC — and we said we need to jar at the cost of doing business. We found other distributors in the area that would package at 95 cents to $1.35 per jar, and David's assertion was that we were under a service contract with him and for him to pay back his expenses, his rate was $1.50 and we could take it somewhere else if we wanted to." RT: 1179: 2-10. Steve Dodge summarized the situation in his March 29, 2019, email to Elizabeth Cader, after Addington's one-word response ("No") to the subtenants' proposed contiguous space solution; Steve wrote: "Is this guy [Addington] just going to kill three other licenses, just like that?" Exh. 121.

**F. Tobias' and Humboldt's' Relationships were Disrupted.**

Tobias testified that Humboldt was forced to turn away business and lost accounts due to Addington's actions. See Section II.D, above; see also, RT: 1441: 4-25: "It kind of culminated with a company named Highrize, which is a preroll company, where we just — we were unable to fulfill their needs at all. We lost that account temporarily.

Q. And why were you unable to fill Highrize's needs?

Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 47 of 58

A. Because we didn't have a space to package and the — and the person who was offering us packaging services wasn't doing it in a timely manner.

Q. And that person was whom?

A. David Addington and CHAMP." See also, 1442: 1-9; 1480: 7-17: "Then back to the left bottom, you can see bulk sales, package sales, and total sales. That's taken directly from our QuickBooks for those years. And you can see in 2018, while we were only using the small 100-square-foot office, we had 36 sales in that time period and that they were all bulk sales where we were selling to local distributors. We actually were unable to do any packaging in that time period and lost considerably -- all of our packaged sales were lost during that time period."

**G. Tobias/Humboldt were Harmed by the Disrupted Relationships.**

Section II.D (above) shows the harm Humboldt suffered, broken down by specific categories, resulting from Piner Partners' breach of contract. The same evidence shows the harm caused by the disrupted relationships.

**H. Addington' Conduct was a Substantial Factor in Causing Cross-Complainants' Harm.**

CACI defines "substantial factor" as "a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" *Ibid.* Sections II C and D (above) describe the connection between Addington's conduct and Cross-complainants' harm.

Here, the <u>only</u> reason Humboldt opened a second distributorship in remote Phillipsville and lost accounts was because Addington prevented Humboldt from operating at the Piner Place facility. RT: 1411: 11-25, 1412: 1-2; RT: 1425: 25; 426: 1-12; 1446: 8-21.

**VII. Cross-Defendants did not prove the affirmative defense of Unclean Hands.**

Based on the evidence and testimony, the Court rejects Cross-defendants' unclean hands defense. The Court finds there is no misconduct by Cross-complainants that would prejudicially affect the rights of Cross-Defendants so that it would be inequitable to grant any relief against them.

**VIII. Piner Partners and Addington are Jointly and Severally Liability for All Damages awarded to Humboldt Growers Network and Tobias Dodge.**

Based on the evidence and testimony, Addington committed Interference with Economic Relations, both individually and on behalf of Piner Partners. The undisputed evidence also showed that Addington as an individual was a general partner of Piner Partners, rendering him personally liable for Piner Partners' liability under both the Breach of Contract and Interference with Economic Relations causes of action. See, Corps. Code §16306.

WHEREFORE, based on the foregoing, the Court finds and orders that,

1. David Addington and Piner Partners shall take nothing from any and all defendants under their complaint in this action.
2. Ridgeway Parties shall be awarded damages in the sum of $58,006.50 on their cross-complaint against David Addington and Piner Partners, LLC who are both jointly and severally liable for said damages.
3. Humboldt Growers Network and the Dodges shall be awarded damages in the amount of $2,580,000 against David Addington and Piner Partners, LLC who are both jointly and severally liable for said damages.

IT IS SO ORDERED.

Dated: November 8, 2023.

Honorable Bradford DeMeo
Judge of the Superior Court

PROOF OF SERVICE BY MAIL

I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 600 Administration Dr., Room 107-J, Santa Rosa, California, 95403; that I am not a party to this case; that I am over the age of 18; that I am readily familiar with this office's practice for collection and processing of correspondence for mailing with the United States Postal Service; and that on the date shown below I placed a true copy of

***AMENDED FINAL STATEMENT OF DECISION***

in an envelope, sealed and addressed as shown below, for collection and mailing at Santa Rosa, California, first class, postage fully prepaid, following ordinary business practices.

Date: November 08, 2023

Robert Oliver
Clerk of the Court

By: *Sarah Helstrom*
Sarah Helstrom, Deputy Clerk

-ADDRESSEES-

DAVID ADDINGTON
298 SAINT JAMES DRIVE
PIEDMONT CA 94611

DANIEL SHANE RAFF
EDWIN LAMAR BRADLEY II
RAFF LAW APC
THE GRACE BUILDING
17 KELLER STREET
PETALUMA CA 94952

ROSS BRIAN JONES
ROSS B JONES ATTORNEY AT LAW
131A STONY CIRCLE #500
SANTA ROSA CA 95401

SUZANNE KELLY BABB
BEYERS COSTIN SIMON
PO BOX 878
SANTA ROSA CA 95402

PETER WYMAN CRAIGIE
CRAIGIE MCCARTHY & CLOW
540 PACIFIC AVE
SAN FRANCISCO CA 94133

# EXHIBIT 3 TO DECLARATION

# OF ROSS B. JONES

**Ruling On Matter Taken Under Submission re: Order to Show Cause re: Vexatious Litigant filed in Sonoma County Case No. SCV-264723**

HON. JANE GASKELL
JUDGE OF THE SUPERIOR COURT
Courtroom 17
3035 Cleveland Avenue
Santa Rosa, CA 95403
(707) 521-6723

FILED

APR 10 2026

Clerk of Superior Court of California,
County of Sonoma
By ____ Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA

| | |
|---|---|
| DAVID ADDINGTON, an individual, and PINER PARTNERS, a California general partnership<br><br>Plaintiff,<br><br>v.<br><br>RIDGEWAY DISTRIBUTION, LLC, a California registered limited liability company; VIRGINIA PASINI, an individual; ANTHONY PIZZARELLI, an individual; NACC, INC., a California corporation; and DOES 1-50,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTIONS. | **RULING ON MATTER TAKEN UNDER SUBMISSION RE: ORDER TO SHOW CAUSE RE: VEXATIOUS LITIGANT**<br><br>Case No. SCV-264723<br><br>(Hearing Date: April 2, 2026) |

The above matter came on calendar on April 2, 2026, in Department 17 of the above-captioned court, the Honorable Jane Gaskell, presiding. Plaintiff/Cross-Defendant David Addington ("Addington") appeared on behalf of himself. Counsel Ross B. Jones appeared on behalf of Defendants/Cross-Complainants Humboldt Growers Network, Inc. and Tobias Dodge ("Humboldt").

The Court, having reviewed all related filings and having heard and considered the oral arguments presented, hereby issues an Order declaring Addington as a vexatious litigant under Code of Civil Procedure ("C.C.P.") sections 391 and 391.7.

## I. PROCEDURAL HISTORY

Addington has filed numerous post-appeal motions for the Court to reconsider, vacate, set aside, correct, or void its Statement of Decision and Judgment entered after

Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 52 of 58

court trial in this matter, which held both Addington and Piner Partners jointly and severally liable for an award of $2,580,000.00. (Humboldt MPA, pp. 2-3.) These include:

1. Motion to Vacate Judgment filed June 16, 2025;
2. Motion to Set Aside or Vacate Judgment filed June 23, 2025;
3. Request for Court Judgment Correction filed November 13, 2025;
4. Motion to Void Judgment filed November 18, 2025;
5. Motion to Vacate Void Judgment filed February 13, 2026;
6. Motion to Void Judgment for Excess of Jurisdiction filed February 24, 2026;
7. Motion to Vacate Void Judgment Due to Failure to Make Required Findings filed March 4, 2026; and
8. "Final" Motion to Void Judgment filed April 2, 2026.

On March 12, 2026, the Court issued an Order for Addington to appear and show cause on Thursday, April 2, 2026, as to why the Court should not declare him a vexatious litigant and make him subject to a prefiling order prohibiting him from filing any new litigation without obtaining leave of the Presiding Judge of this Court first. (Order dated March 12, 2026, 1:26-28, 2:1-2.)

The parties appeared and presented oral argument. Addington presented an impassioned argument stating that there was no basis for him to be declared as a vexatious litigant and that he had not filed any more motions of the same nature since the Order to Show Cause had been issued. In fact, per the Court's record, he had filed a "Final Motion to Void Judgment" on that same day. Humboldt's counsel argued there was adequate basis to have Addington declared as a vexatious litigant, for the reasons stated in Humboldt's MPA. The Court now considers the parties' argument to issue a ruling on the matter under submission.

//

//

//

## II. **ANALYSIS**

A. Legal Standard

Per C.C.P. section 391.7, "the court may, on its own motion or the motion of any party, enter a prefiling order which prohibits a vexatious litigant from filing any new litigation in the courts of this state in propria persona without first obtaining leave of the presiding justice or presiding judge of the court where the litigation is proposed to be filed."

Under C.C.P. section 391, a "vexatious litigant" is a person who does any of the following:

> 1. In the immediately preceding seven-year period has commenced, prosecuted, or maintained in propria persona at least five litigations other than in a small claims court that have been (i) finally determined adversely to the person or (ii) unjustifiably permitted to remain pending at least two years without having been brought to trial or hearing.
>
> 2. After a litigation has been finally determined against the person, repeatedly relitigates or attempts to relitigate, in propria persona, either (i) the validity of the determination against the same defendant or defendants as to whom the litigation was finally determined or (ii) the cause of action, claim, controversy, or any of the issues of fact or law, determined or concluded by the final determination against the same defendant or defendants as to whom the litigation was finally determined.
>
> 3. In any litigation while acting in propria persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay.
>
> 4. Has previously been declared to be a vexatious litigant by any state or federal court of record in any action or proceeding based upon the same or substantially similar facts, transaction, or occurrence.
>
> 5. After being restrained pursuant to a restraining order issued after a hearing pursuant to Chapter 1 (commencing with Section 6300) of Part 4 of Division 10 of the Family Code, and while the restraining order is still in place, they commenced, prosecuted, or maintained

one or more litigations against a person protected by the restraining order in this or any other court or jurisdiction that are determined to be meritless and caused the person protected by the order to be harassed or intimidated.

B. <u>Humboldt's Arguments</u>

Humboldt requests that the Court declare Addington a vexatious litigant, drop all of Addington's pending motions from the calendar, and require Addington to seek approval from the Presiding Judge and post a bond if he intends to file any future motions. (Humboldt MPA, 1:1, 2:1-3.)

Humboldt finds that Addington meets two of the definitions of a vexatious litigant under section 391 listed as subsections (b)(2) and (b)(3). (*Id.* at 4:2-19.) Humboldt requested Addington to withdraw his motions and seeks that the Court order him to do so. Humboldt offers CCP 128 as legal authority to support that the Court should withdraw the motions that have already been filed.

C. <u>Addington's Response</u>

Addington filed a request for clarification of the minute order entered March 12, 2026, arguing that the Court "misframes" the issue and once more tries to re-argue the same points argued in his numerous motions to vacate, void, correct, or set aside the Statement of Decision and Judgment entered after court trial in this matter. (Request for Clarification of Order of March 12, 2026, pp. 1-2.)

Addington argues that his behavior does not meet the legal requirements of a vexatious litigant under section 391 because he has not lost multiple cases, has not been declared a vexatious litigant anywhere else, has not relitigated the same issues, and has not filed unmeritorious or frivolous motions or taken any action intended to harass or delay. (Addington's Response, pp. 1-2.)

D. <u>Humboldt's Reply</u>

Humboldt states that, even though Addington says he will not file more motions, he told the Court he would withdraw his pending motions previously and refuses to do so now, so the Court cannot rely on this. (Reply, pp. 1-2.)

Case: 25-04032 Doc# 32 Filed: 08/13/26 Entered: 08/13/26 17:18:55 Page 55 of 58

E. Application

First, the Court finds that Addington is attempting to argue a motion for reconsideration regarding the Court's order on March 12, 2026, restyled and titled as a "Request for Clarification." A response to an Order to Show Cause issued by this Court is not the appropriate avenue to request the Court to reconsider its previous order, especially when the Court's order to show cause is as to whether Addington should be declared as a vexatious litigant for doing just what this "Request for Clarification" demonstrates he is doing: refiling differently titled motions to relitigate the validity of the same Statement of Decision and Judgment that was entered after a court trial in this matter.

Second, for the same reason stated above, the Court finds that Addington does squarely fit the description in section 391(b)(2) of a vexatious litigant. He has filed at least 8 of the same type of motion titled differently to relitigate the validity of the same Judgment. Therefore, the Court finds that there is sufficient basis to declare Addington as a vexatious litigant.

Third, Humboldt requests that the Court drop the motions pending, but did not offer any legal authority to support that position. In *Goodrich v. Sierra Vista Regional Medical Center* (2016) 246 Cal.App.4th 1260, 1263 ("*Goodrich*") the trial court in the underlying action had denied three separate motions attempting to relitigate the court's final judgment on a writ petition. That Court had ruled on the motions and also declared the filing party as a vexatious litigant under section 391(b)(3) for filing multiple unmeritorious and frivolous motions. The Court finds that *Goodrich* supports the Court's authority to rule on the motions that were pending previously before assigning the vexatious litigant status upon Addington. Thus, Addington's status applies to all future motions filed, but the Court will not drop the pending motions that were filed prior.

//

//

//

## III. CONCLUSION

For the reasons stated above, the Court enters an order declaring Addington as a vexatious litigant under C.C.P. section 391(b)(2).

**IT IS SO ORDERED.**

DATED: April 10, 2026

JANE GASKELL
Judge of the Superior Court

PROOF OF SERVICE BY ELECTRONIC MAIL

I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 3055 Cleveland Ave, Santa Rosa, California, 95403, and my email address is aolazar@sonomacourt.org; that I am not a party to this case; that I am over the age of 18 years; that I am readily familiar with this office's practice for collection and processing of correspondence for electronic mailing; and that on the date shown below I placed a true copy of the ***RULING ON MATTER TAKEN UNDER SUBMISSION RE: ORDER TO SHOW CAUSE RE: VEXATIOUS LITIGANT*** noted attachments by electronic mailing to each addressee respectively as indicated below.

Date: April 10, 2026

Robert Oliver
Clerk of the Court

By: *Ashley E. Olazar*

Ashley E. Olazar, Deputy Clerk

-ADDRESSEES-

DAVID P. ADDINGTON
dpapiedmont@gmail.com

ROSS B. JONES, ESQ.
ROSS B. JONES, ATTORNEY AT LAW
ross@rossjoneslaw.com